UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v-

RUBIEL GOMEZ,

Defendant.

18 Cr. 341 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

The Court has received a request from defendant Rubiel Gomez seeking a reduction of his 120-month term of imprisonment, which he is serving at Federal Correctional Institution Ray Brook ("Ray Brook") under 18 U.S.C. § 3582(c)(1)(A)(i). Dkt. 39 ("Def. Mem."). The Government opposes this request. Dkt. 40 ("Gov't Mem."). For the following reasons, the Court denies the request.

On October 29, 2017, Gomez—along with Jose Nunez and a co-conspirator—planned to sell marijuana at the garage of a building located in the Washington Heights neighborhood of Manhattan. *See* Dkt. 17 ("PSR") ¶ 11. While the two men were in an elevator transporting them to the drug transaction's location, Nunez gave Gomez a .38 caliber Smith & Wesson revolver, which Gomez placed in his jacket pocket. *Id.* ¶ 13. Gomez then sat in the front passenger seat of a vehicle parked in the garage. *Id.* ¶ 14. Gomez stayed there as he, Nunez, and the co-conspirator awaited the arrival of the buyers. *Id.* When the buyers arrived, Nunez and the co-conspirator went to meet them while Gomez remained in the car. *Id.* ¶ 16. The buyers and sellers began commencing the transaction. *Id.* Suddenly, Jason Castillo—one of the buyers—pulled out a firearm and pointed it at Nunez and the co-conspirator. *Id.* ¶ 17. Castillo forced

1

Nunez and the co-conspirator to the ground at gunpoint and hit the men with the gun as they lay there. *Id.* Castillo and an accomplice then began to search the pockets of Nunez and the co-conspirator, taking a cellphone and a firearm. *Id.*

As Castillo and his accomplice continued to rob Nunez and the co-conspirator, Castillo's accomplice looked up and noticed Gomez sitting in the nearby car. *Id.* ¶ 18. Gomez—realizing that Castillo had noticed him—exited the car and fired a series of shots toward Castillo and his accomplice. *Id*; Dkt. 25 ("Sent. Tr.") at 11, 23. Gomez hid behind a pillar after firing the shots. PSR ¶ 19. Eventually Nunez and the co-conspirator rose from the ground and fled toward the garage exit, toward the direction where Gomez hid behind the pillar with firearm in hand. *Id.* Gomez mistook his fleeing associates for the robbers and fired his gun, shooting Nunez. *Id.*; Sent. Tr. at 23. Gomez and the co-conspirator then left the garage. Nunez was pronounced dead the next morning. PSR ¶ 21.

On May 14, 2018, Gomez pled guilty to a two-count information that charged him with violating 21 U.S.C. § 841(b)(1)(D) (possession and distribution of less than 50 kilograms of marijuana) (Count One) and 18 U.S.C. § 924(c)(1)(A)(iii) (possession and discharge of a firearm in relation to his marijuana possession and distribution activity) (Count Two). *See* Dkt. 24.

On October 20, 2018, the Court sentenced Gomez to 120 months and one day of imprisonment, the bottom of the applicable Guidelines range of 120 to 126 months yielded by Gomez's offense level (4), his criminal history category (III), and the mandatory 10-year consecutive sentence required by the Count II firearms count. Sent. Tr. at 6–7. As of today, Gomez has served approximately 48 months, or 40%, of that sentence. Gov't Mem. at 6; Def. Mem. at 1. His projected release date, with good time credit, is June 6, 2026. Gov't Mem. at 6; Def. Mem. at 1.

On February 4, 2021, the Court received a *pro se* motion from Gomez seeking his early release due to the COVID-19 pandemic. Dkt. 28. On February 8, 2021, Gomez's appointed counsel filed a memorandum in support. *See* Def. Mem. Gomez argues that a sentence reduction is warranted in light of (1) prison conditions at Ray Brook during COVID-19; (2) the length of his sentence; (3) the fact that one robber, Castillo, received a 120-month sentence, one day shorter than Gomez's; (3) his strong family support; (4) his remorse; and (5) his rehabilitation in prison. That said, Gomez does not seek release today; rather, he seeks a sentence reduction under § 3852. Def. Mem at. 9.

On April 30, 2021, the Government filed its opposition. Gov't Mem. It argues first that Gomez has not shown that he has exhausted his administrative remedies because, although Gomez attached a copy of a letter purportedly submitted to BOP, BOP denies having received any such letter. Second, the Government argues that the oppressive conditions of confinement occasioned by the COVID-19 pandemic do not support release here, as none are specific to Gomez's circumstances. Third, it argues that the § 3553(a) factors are incompatible with release, given the small portion of the 120-month sentence that Gomez to date has served and that none of Gomez's 15 prior convictions deterred him from the crimes of conviction.

Under 18 U.S.C. § 3582(c)(1)(A), a court

> upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf . . . may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that— (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Here, the Government makes the threshold argument that Gomez's motion should be denied because he has failed to exhaust his administrative remedies. Gov't Mem. at 2. Gomez

3

counters that, on July 30, 2020, he submitted a request to the Warden at Ray Brook seeking his compassionate release. Def. Mem. at 6. But, he states, to date, there has been no response to the letter. *Id.* The Government responds that the BOP has "no record of the defendant having made such request." Gov't Mem. at 2. However, in his reply, Gomez attests to sending the July 2020 compassionate release request both through the normal manner and having made an additional request dated May 28, 2021. Dkt. 45 ("Def. Reply").

The Court here need not resolve this factual dispute or whether Gomez properly exhausted his administrative remedies. That is because the Court concludes, on the merits, that a sentence reduction under 18 U.S.C. § 3582(c) is not currently warranted. *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease."); *United States v. Clarke*, No. 09 Cr. 705 (LAP), 2010 WL 4449443, at *1 (S.D.N.Y. Oct. 29, 2010).

Originally, § 3582(c)(1)(A) did not permit prisoners to initiate compassionate release proceedings, and instead required the BOP to seek such release on their behalf. *United States v. Ebbers*, 432 F. Supp. 3d 421, 422–23, 427 (S.D.N.Y. 2020). But with the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, Congress amended the law to allow defendants independently to seek compassionate release from federal courts. *Ebbers*, 432 F. Supp. 3d at 422–23.

Before the First Step Act, Congress had tasked the Sentencing Commission with identifying circumstances that are sufficiently extraordinary and compelling to justify a reduction in sentence. *Id.* at 427 (citing 28 U.S.C. § 994(t)). The Commission did so in U.S.S.G. § 1B1.13 and its corresponding commentary. That guidance, *inter alia*, (1) sets out circumstances that present extraordinary and compelling reasons justifying release; and (2) requires that a defendant not be a danger to the community. *Id.* § 1B1.13(1)–(3) & cmt. n.1(A)–(D).

By its terms, however, the Commission's guidance applies only to a "motion of the Director of the Bureau of Prisons." *Id.* § 1B1.13. And the Commission has not updated § 1B1.13 or its commentary to reflect the First Step Act's amendment to § 3582(c)(1)(A) authorizing defendants to move for compassionate release on their own, without the intervention of the BOP. Accordingly, although courts—including this one—had treated the Commission's guidance as applicable to all compassionate release motions, *see, e.g.*, *United States v. Hernandez*, 451 F. Supp. 3d 301, 303 (S.D.N.Y. 2020); *see also Ebbers*, 432 F. Supp. 3d at 428, the Second Circuit has since clarified that § 1B1.13 "is not 'applicable' to compassionate release motions brought by defendants," rather than by the BOP, and "cannot constrain district courts' discretion to consider whether any reasons are extraordinary and compelling" in such cases. *United States v. Brooker*, 976 F.3d 228, 236 (2d Cir. 2020); *see also id.* at 237 ("Neither Application Note 1(D), *nor anything else in the now-outdated version of Guideline § 1B1.13*, limits the district court's discretion." (emphasis added)).

Consistent with *Brooker*, in assessing a § 3582(c) motion brought directly by a defendant, the Court is not constrained by either § 1B1.13's enumeration of extraordinary and compelling reasons or by its freestanding requirement that the defendant seeking release not pose any danger to the community. Rather, the Court, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," 18 U.S.C. § 3582(c)(1)(A)(i), may "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [it] in motions for compassionate release." *Brooker*, 976 F.3d at 237.

The parties dispute both whether Gomez's case presents extraordinary and compelling reasons warranting a sentence reduction and whether such a reduction is compatible with the § 3553(a) factors. The Court takes each in turn.

5

The COVID-19 pandemic has presented an extraordinary danger to the public and to inmates. The crowded nature of federal prisons has made them a hotbed for viral spread. Gomez himself has suffered from COVID-19, although he states that he has recovered. Def. Mem. at 6–7. Beyond the risks to health, the pandemic has subjected inmates to far more restrictive conditions of confinement, including limits on access to visitors and family, far beyond what could have been expected at the time of sentencing. For these reasons, in the past months, courts, including this one, have ordered the temporary release of inmates held in pretrial or presentencing custody[1] and the compassionate release of certain high-risk inmates serving federal sentences.[2]

---

[1] *See, e.g.*, *United States v. Chandler*, --- F. Supp. 3d ---, No. 19 Cr. 867 (PAC), 2020 WL 1528120, at *1–*3 (S.D.N.Y. Mar. 31, 2020) (granting bail application, under 18 U.S.C. § 3142(i), of defendant charged with being a felon in possession of a firearm); *United States v. McKenzie*, 450 F. Supp. 3d 449 (S.D.N.Y. 2020) (granting bond pending sentencing, under 18 U.S.C. § 3145(c), to defendant who had pleaded guilty to single count of assault with a deadly weapon and had been released on bond); *United States v. Witter*, No. 19 Cr. 568 (SHS), Dkt. 40 at 2–3 (S.D.N.Y. Mar. 26, 2020) (granting bond pending sentencing, under § 3145(c), to defendant who had pleaded guilty to a narcotics offense); *cf. United States v. Stephens*, 447 F. Supp. 3d 63 (S.D.N.Y. 2020) (granting defendant's request for reconsideration of bail conditions and releasing him to home confinement, while noting that, in the alternative, § 3142(i) would require his temporary release).

[2] *See, e.g.*, *United States v. Wilson*, 16 Cr. 317 (PAE), Dkt. 656 at 4–7 (S.D.N.Y. Aug. 31, 2020) (ordering compassionate release of defendant with heighted vulnerability who had served the substantial majority of his sentence and played a low-level role in a drug trafficking conspiracy); *United States v. Simon*, 18 Cr. 390 (PAE), Dkt. 507, at 5–9 (S.D.N.Y. Aug. 27, 2020) (ordering compassionate release of elderly defendant, who had serious medical conditions and played a low-level role in a drug trafficking conspiracy); *United States v. Davies*, No. 18 Cr. 390 (PAE), Dkt. 479 at 4–7 (S.D.N.Y. June 26, 2020) (ordering compassionate release of elderly defendant, who had serious medical conditions and played low-level role in drug trafficking conspiracy); *United States v. Brown*, No. 18 Cr. 390 (PAE), Dkt. 472 at 4–7 (S.D.N.Y. June 17, 2020) (same); *United States v. Jasper*, No. 18 Cr. 390 (PAE), Dkt. 441 at 2–4 (S.D.N.Y. Apr. 6, 2020) (ordering compassionate release of defendant with an immune-inflammatory disease who had served all but 34 days of a four-month sentence).

Gomez, who is age 43, admits that he "does not have a medical condition which places him at high risk of serious physical injury" as a result of COVID-19. Def. Mem. at 6. He thus concedes that he does not face any risk beyond that of other inmates in federal custody. And the spread of COVID-19 at FCI Ray Brook has dropped dramatically: there do not currently appear to be any COVID-19 positive inmates at the facility.[3] Also undermining any claim Gomez might make to fear adverse consequences from COVID-19, he has had the opportunity to receive a COVID-19 vaccine, which would have dramatically reduced his risk from the virus, but he has refused to accept it. Gov't Mem. at 5. Actions have consequences. Gomez cannot reasonably claim that his increased risk exposure to COVID-19 warrants a sentence reduction when he has declined to take the one action that—incarcerated or not—would materially reduce the risks to him from COVID-19. *See, e.g.*, *United States v. Bullock*, No. 18-CR-528 (JMF), 2021 WL 1550424, at *1 (S.D.N.Y. Apr. 20, 2021) (noting that defendant "cannot satisfy his burden of showing that relief is warranted based on the fact that he was offered, and he refused, a COVID-19 vaccine"). That said, although Gomez's rejection of the vaccine deprives him of the ability to credibly claim to fear grave medical consequences from COVID-19, the severe conditions it has occasioned at Ray Brook since March 2020 present a separate, and meritorious, basis for seeking a reduction of sentence. It is premature to measure the extent of the reduction appropriate to reflect the unexpected rigors of Gomez's confinement with the pandemic still a factor today. But the Court expects, later in Gomez's term, to reduce his sentence to reflect the reality that his imprisonment has been far more onerous than this Court had any reason to expect at the time of sentencing.

---

[3] As of August 10, 2021, there were no COVID-positive inmates at FCI Ray Brook. *COVID-19 Cases*, Fed. Bureau of Prisons (Aug. 10, 2021), https://www.bop.gov/coronavirus.

7

Other factors cited by Gomez in support of sentence reduction are the length of his sentence, his family's support, and his remorse at taking the life of his friend. These factors were apparent at the time of sentencing. They do not provide an "extraordinary and compelling reason" to change his sentence. And to the extent that Gomez points to his efforts to rehabilitate himself since incarceration, these circumstances to which Gomez points—that he has only had one disciplinary transgression since his sentencing and has taken advantage of the educational programs at his facility—while laudable, do not present "extraordinary and compelling reasons" for release. *See* Def. Mem. 11–12.

In any event, even assuming that such reasons existed, Gomez's release at this point, or a reduction of his sentence that would result in his release at any time soon, would be inconsistent with the 18 U.S.C. § 3553(a) factors. These include the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need for the sentence imposed to afford adequate deterrence to criminal conduct; the need for the sentence imposed to protect the public from further crimes of the defendant; and the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. The Court carefully weighed these factors at sentencing less than three years ago and found a 120-month sentence justified. Nothing has fundamentally changed to require a new calculus, save, as noted, the heightened rigors of Gomez's custody since the pandemic struck in March 2020.

In particular, at sentencing, the Court regarded the gravity of Gomez's offense as a persuasive justification for a 120-month sentence. As the Court noted then, Gomez "engaged in

conduct that unavoidably heightened considerably the risk of death" by carrying a gun to a drug deal. *Id*. at 24–25. Indeed "but for [Gomez's] decision to arm [him]self with a pistol while heading downstairs to a deal with drug traffickers, this tragedy might not have happened." Sent. Tr. at 25. The Court also considered the general deterrent interest in a consequential sentence, which would "send a powerful message" to others considering "bringing firearms [to] support the illegal drug trade." *Id.* at 26. Finally, the Court viewed specific deterrence as a weighty factor, given Gomez's long criminal record, which consisted of 15 prior convictions. *Id*. That Gomez's numerous brushes with the criminal justice system had failed to deter him from the instant narcotics and firearms offense "suggests a need for a more substantial sentence than any sentence [Gomez] previously served." *Id.* at 27. The Court also acknowledged mitigating factors, including the fortuity that the drug deal's buyers attempted to rob Gomez's confederates. Had the "drug deal gone off as planned," and robbers not intervened, Gomez likely would not have faced such severe criminal liability. *Id.* at 25. The Court also "appreciate[d] that Gomez had no intention whatsoever of taking [his] friend's life." *Id.* at 24. The case, the Court recognized, was tragic and unusual. *Id.* at 23. On balance, the Court found the § 3553(a) factors to support the mandatory minimum sentence. *Id.* at 24. The Court's reasoning at sentencing holds true today.

For similar reasons, the Court has denied compassionate release applications by other defendants who had yet to serve the bulk of the sentences the Court had found necessary under § 3553(a), even where such defendants could point to heightened vulnerability to COVID-19 and/or to heightened rigors of imprisonment. *See United States v. Cueto*, No. 11 Cr. 1032-80 (PAE), 2021 WL 621188, at *5 (S.D.N.Y. Feb. 17, 2021) (denying compassionate release for a defendant who had served only 30% of his sentence where "the need for just punishment pointed

towards a very high sentence" (internal quotations omitted)); *see also United States v. Ortiz*, No. 16 Cr. 439 (PAE), Dkt. 84 at 2, 6–7 (S.D.N.Y. July 6, 2020) (denying compassionate release for 49-year-old defendant with borderline obesity who had served 70% of 84-month sentence for conspiracy to commit Hobbs Act robbery); *United States v. Leon*, No. 15 Cr. 877 (PAE), Dkt. 320 at 5–7 (S.D.N.Y. June 11, 2020) (denying compassionate release for defendant with asthma who had served 60% of stated sentence of 84 months' imprisonment); *United States v. Romero*, No. 15 Cr. 445 (PAE), 2020 WL 2490027, at *1 (S.D.N.Y. May 14, 2020) (denying compassionate release for a defendant without heightened risk of contracting COVID-19 who had served "approximately 54 months of his significantly below-guidelines sentence of 78 months' incarceration"); *United States v. Francisco*, No. 19 Cr. 131 (PAE), Dkt. 416 at 1, 5 & n.5 (S.D.N.Y. June 29, 2020) (denying compassionate release where defendant had served only 60% of his stated sentence).

The Court thus finds that there are not extraordinary and compelling reasons to warrant release or a sentence reduction at this point, and that the § 3553(a) factors do not favor these outcomes. The Court therefore denies Gomez's motion for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). The Court's denial of Gomez's application is, however, without prejudice to bring a renewed application for a reduction of sentence substantially later in his prison term, based on the unexpected rigors of his imprisonment during the pandemic.

SO ORDERED.

*Paul A. Engelmayer*
PAUL A. ENGELMAYER
United States District Judge

Dated: August 16, 2021
       New York, New York